In re ESTATE of Phyllis Ellerton McCORD, Deceased.

U. S. BRATTON, Jr., Executor, Plaintiff-Appellant,

v.

UNITED STATES of America, Defendant-Appellee.

No. 75–1042.

United States Court of Appeals, Sixth Circuit.

May 30, 1975.

James Beall, Beaumont, Smith & Harris, Detroit, Mich., for plaintiff-appellant.

Ralph B. Guy, Jr., U. S. Atty., Fred M. Mester, Asst. U.S. Atty., Detroit, Mich., Scott P. Crampton, Gilbert E. Andrews, Loring W. Post, Appellate Section, Tax Div., Dept. of Justice, Robert T. Duffy, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WEICK and McCREE, Circuit Judges, and CECIL, Senior Circuit Judge.

McCREE, Circuit Judge.

This is an appeal from the grant of summary judgment in favor of the government in an action for the refund of federal estate taxes. The parties stipulated the facts and the only issues before us are questions of law.

The decedent died November 12, 1968, leaving a gross estate amounting to $1,679,269.61. She was survived by the only child born to her, a daughter suffering from Down's Syndrome (Mongolism). The child had resided in a state institution in Lapeer, Michigan, for twelve years before the death of her mother. After making a number of specific bequests, the decedent established a testamentary trust of the residue of her estate to provide for the support and care of the daughter during her lifetime, and, at her death, for the distribution of the remainder to designated charities qualifying under Section 2055 of the Internal Revenue Code of 1954 (26 U.S.C. § 2055). The trust agreement permits the trustees to invade the trust corpus, if necessary, to provide for the daughter in a manner consistent with her accustomed standard of living. It also permits the payment of any surplus income beyond that required for the daughter's support to the institution wherein the daughter might reside, or to other charities. Another provision authorized the trustees to terminate the trust before the death of the daughter if it should be in her best interest.

The provisions relating to the distribution of surplus income and termination of the trust are found in Article V of the will. They provide:

(a) It shall be the duty of my Trustees to pay such portion of the income derived from the trust estate to my said daughter, or to her Guardian, as shall in their sole judgment be necessary or expedient to properly and adequately provide for the support, maintenance and welfare of my said daughter. Said income shall be payable quarterly or at more frequent intervals, if the accumulation of income is sufficient to warrant it, or if, in the sole judgment and discretion of my Trustees, more frequent distribution is required or justified by the needs of my beneficiary. If in any year said net income exceeds the amount necessary for the support and maintenance of my said daughter, then I direct that my Trustees, in their sole discretion, distribute such surplus income to such institution as my daughter may at that time reside, or to such other charitable or religious institutions as my Trustees in their sole judgment or discretion may determine. It is my primary objective or concern that my Trustees at all times make certain that such funds as are employed for the betterment of the condition under which my daughter is living, shall be directed especially toward improvements in the Unit or Village, so-called, in which my said daughter is at any such time living.

(b) I further direct that my Trustees herein nominated shall in their sole judgment and discretion have the right at any time during the operation of the trust, to invade the principal and distribute therefrom should they at any time conclude that the trust income, together with the separate income which the beneficiary may have, is insufficient to afford said beneficiary with the necessaries of life in keeping with the standard to which she is accustomed; and I do authorize my said Trustees to distribute the entire principal and income of said trust estate at any time prior to the time the trust would otherwise terminate in the manner hereinbefore set forth, if in their sole judgment and discretion, such earlier distribution is justified and warranted by the circumstances existing at the time of any such distribution of principal, it being my chief motive in establishing the within trust to attempt to guarantee the use and disposal of my trust estate at all times

for the best interest of the beneficiary herein named.

The district court determined that the Internal Revenue Service correctly disallowed the entire $490,404.52 charitable deduction claimed by the estate because the will permitted the trustees to distribute surplus income to a residence of the daughter that might not be a charity and also authorized the trustees to terminate the trust without regard to an ascertainable standard and distribute the principal in the "best interest" of the daughter.

The two issues[1] presented in this appeal are (1) whether the provision allowing for the early termination of the trust is governed by an ascertainable standard that assures that the amount to be bequeathed to the charities can be reliably predicted, and (2) whether the will permits the trustees to pay excess income to non-charitable institutions in unascertainable amounts.

Section 2055 of the Internal Revenue Code of 1954[2] provides that an estate may deduct the value of charitable bequests made by it. Treasury Regulation § 20.2055–2 provides that: "If a trust is created or property is transferred for both a charitable and a private purpose, deduction may be taken of the value of the charitable beneficial interest only insofar as that interest is presently ascertainable, and hence severable from the noncharitable interest  . . . . Thus, if money or property is placed in trust to pay the income to an individual during his life, or for a term of years, and then to pay the principal to a charitable organization, the present value of the remainder is deductible."

\* \* \* \* \* \*

The Supreme Court has decided three cases concerning ascertainable standards as they relate to charitable remainders. In Ithaca Trust Co., Executor v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), the testator bequeathed the residue of his estate in trust to pay the income to his wife for life. The trustee was granted the authority to invade corpus for any sum "that may be necessary to suitably maintain her in as much comfort as she now enjoys." 279 U.S. at 154, 49 S.Ct. at 291. The Court held that the value of the charitable remainder was deductible because "[t]he standard was fixed in fact and capable

---

1. The parties agree that the case must be remanded to the district court for computation and refund of the tax liability because of the disallowance of claimed deductions for attorneys' and executors' fees. See First National Bank of Oregon v. United States, 448 F.2d 575, 578 (9th Cir. 1973).

2. Internal Revenue Code of 1954 (26 U.S.C.):

    § 2055. Transfers for public, charitable, and religious uses.

    (a) In General.—For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate the amount of all bequests, legacies, devises, or transfers (including the interest which falls into any such bequest, legacy, devise, or transfer as a result of an irrevocable disclaimer of a bequest, legacy, devise, transfer, or power, if the disclaimer is made before the date prescribed for the filing of the estate tax return)—

    (1) to or for the use of the United States, any State, Territory, any political subdivision thereof, or the District of Columbia, for exclusively public purposes;

    (2) to or for the use of any corporation organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, including the encouragement of art and the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private stockholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation;

    (3) to a trustee or trustees, or a fraternal society, order, or association operating under the lodge system, but only if such contributions or gifts are to be used by such trustee or trustees, or by such fraternal society, order, or association, exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, and no substantial part of the activities of such trustee or trustees, or of such fraternal society, order, or association, is carrying on propaganda, or otherwise attempting to influence legislation  . . . .

of being stated in definite terms of money." . *Id.*

In Merchants National Bank v. Commissioner, 320 U.S. 256, 64 S.Ct. 108, 88 L.Ed. 35 (1943), the testator provided a testamentary trust from which the income was to be paid to the testator's widow for life, and on her death all but a specified amount of the principal was to be distributed to designated charities. The trustee was authorized to invade the corpus for the "comfort, support, maintenance, and/or happiness" of the widow and was directed to exercise that discretion with liberality towards the widow and to consider her "welfare, comfort and happiness prior to claims of residuary beneficiaries."

The Supreme Court distinguished *Ithaca* on the basis that under the will's terms the "extent to which the principal might be used was not restricted by a fixed standard based on the widow's prior way of life." 320 U.S. at 261, 64 S.Ct. at 111. The Court emphasized that "the purposes for which the widow could, and might wish to have the fund spent do not lend themselves to reliable prediction." *Id.* at 262, 64 S.Ct. at 112.

In the third Supreme Court decision, Henslee v. Union Planters National Bank & Trust Co., 335 U.S. 595, 69 S.Ct. 290, 93 L.Ed. 259 (1948), the testator left his entire estate in trust for his 85 year old mother during her lifetime, after which certain specific bequests were to be made and the residue of the estate was to be divided equally among four named charities. The trustees were directed to pay $750 per month from the income of the trust and the testator also provided that: "In addition to this amount my said executors and trustees are authorized and empowered to use and expend in their discretion any portion of my estate, either income or principal, for the pleasure, comfort and welfare of my mother." 335 U.S. at 596, 69 S.Ct. at 291. The trustees were further admonished that the "first object to be accomplished" was to provide for her "in such manner as she may desire." *Id.* She died three years later without invad-

ing the corpus of the trust. The Court held for the government emphasizing the subjective criteria upon which the power to invade was based and the resulting difficulty of predicting the amount by which the remainder might be diminished.

■ We consider first whether the provision authorizing the trustees to terminate the trust before its termination at the daughter's death is governed by an ascertainable standard. The pertinent language of the will permits the trustees to terminate the trust "if in their sole judgment and discretion, such ·earlier distribution is justified and warranted by the circumstances existing at the time of any such distribution of principal, it being my chief motive in establishing the within trust to attempt to guarantee the use and disposal of my trust estate at all times for the best interest of the beneficiary . . . ."

Although there may be legal differences between the power to terminate a trust and discretionary authority to invade its corpus for the benefit of a life beneficiary, we believe the invasion of corpus cases are sufficiently analogous to provide us with helpful insights about ascertainable standards. We agree with the district court's observation that: "The 'circumstances' necessary to precipitate early termination of the trust are neither enumerated or explained." Accordingly, this case does not fall within the *Ithaca Trust* line of cases where to maintain the accustomed standard of living of the beneficiary was the sole authorization for invading the corpus. Instead, we consider a case where there is no reviewable standard governing the termination of the trust. The trustees here have an even broader discretion than was the case in *Union Planters Bank, supra,* where the charitable deduction was denied although the Court observed: "there may have been little chance of that extravagance which would waste a part or consume the whole of the charitable interest, that chance remained. What common experience might regard as remote in the gen-

erality of cases may nonetheless be beyond the realm of precise prediction in the single instance." 335 U.S. at 599, 69 S.Ct. at 292. *See also* Gammons v. Hassett, 121 F.2d 229 (1st Cir.), cert. denied, 314 U.S. 673, 62 S.Ct. 136, 86 L.Ed. 539 (1941); State Street Bank & Trust Co. v. United States, 313 F.2d 29 (1st Cir. 1963); Vaccaro v. United States, 224 F.Supp. 307 (D.C.Mass.1964).

■ Appellant contends that the district court incorrectly assumed that if the trust should be terminated before the beneficiary's death, the trust assets could be distributed to noncharitable organizations. We agree with the district court that the language in the termination provision would allow the trustees to give the trust assets to the daughter or to a noncharitable institution if they believed it was in the best interest of the daughter. If the daughter lived at a noncharitable institution and the trustees determined "in their sole judgment and discretion" that the "circumstances" warranted it, they could terminate the trust and make a gift of the principal to the institution.

■ The second issue presented is whether the agreement permits the trustees to spend excess income on improvements for a noncharitable institution where the daughter might reside. The trustees have the authority under the will to determine where the daughter resides. In fact, in 1970 the daughter was moved from the Lapeer State Home and Training School to the Coleman Foundation, a charitable residential care facility located in Hudsonville, Michigan. It is within the trustees' authority and discretion to place her in a noncharitable institution as well as in a charitable one. Appellant contends, however, that the phrase in the will authorizing the trustees to "distribute such surplus income

to such institutions as my daughter may at that time reside, or to *such other* charitable or religious institutions as my trustees in their sole judgment may determine," permits the trustees to pay excess income only to a charitable or religious institution. (Emphasis added). Appellant urges us to consider the will as a whole in order to determine the testatrix's intent. In re Lawton Estate, 347 Mich. 143, 79 N.W.2d 463 (1956); In re Charlton Estate, 9 Mich.App. 625, 157 N.W.2d 821 (1968). We believe the terms of the trust agreement read together indicate that the testatrix intended to authorize the trustees to pay the excess income of the trust to any institution in which her daughter might live, regardless whether it was private or state-supported, charitable or noncharitable. Under Michigan law, a testator's dominant charitable purpose will not be defeated by technical construction of the terms of the trust. Love v. Sullivan, 5 Mich.App. 201, 146 N.W.2d 117 (1966). However, we believe the testatrix's overriding concern, as expressed in the last sentence of Article V(b) was to guarantee that the trust income and principal would be used for the "best interest" of her daughter. As the Third Circuit said in Zentmayer's Estate v. Commissioner, 336 F.2d 488, 490 (1964): "the question is not . . . what the trustees were likely to do, but what they had the power to do." We believe the trustees had the power to use the excess income to improve a noncharitable institution if the daughter should reside there.

The district court's judgment concerning the early termination and excess income provisions is affirmed and the cause is remanded for the entry of judgment refunding that portion of the tax based on the deduction claimed for attorneys' and executors' fees.