1 F.3d 830
 WELLS FARGO BANK, Trustee of that Certain Testamentary Trust
Established Under the Will of Anita Johnson Wand,
Now Deceased, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant;
Occidental College, Charity Remainderman of that Certain
Testamentary Trust Established Under the Will of
Anita Johnson Wand, Now Deceased,
Real-Party-In-Interest-Appellee.
 No. 91-55692.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 8, 1992.
Decided July 27, 1993.
 
 Arlen D. Woffinden and Dominic T. Holzhaus, Latham & Watkins, Los Angeles, CA, for plaintiff-appellee and for the real-party-in-interest-appellee.
 Ann Belanger Durney, U.S. Dept. of Justice, Washington, DC, for defendant-appellant.
 Appeal from the United States District Court for the Central District of California.
 Before: FLETCHER, O'SCANNLAIN, and KLEINFELD, Circuit Judges.
 KLEINFELD, Circuit Judge:
 
 
 1
 This case involves estate tax deductibility of a charitable remainder pursuant to 26 U.S.C. Sec. 2055. The testatrix, Anita Wand, provided in her will for a life interest for her employee James Fuller, and a remainder for Occidental College. The trustee under the will, Wells Fargo, seeks a tax refund of approximately $1.4 million. The issues are whether Wand's will was executed before 1979 despite a 1982 codicil, and whether Occidental College's remainder was "presently ascertainable." The district court determined that both conditions were met. We affirm.
 
 I. Facts
 
 2
 The case comes up on stipulated facts and summary judgment. On April 5, 1971, Anita Wand executed a will creating a trust for two beneficiaries, her long time employee James Fuller, and Occidental College, an educational institution qualifying for tax treatment as a charity. Mr. Fuller was to receive $250.00 per month for life, use of Mrs. Wand's house, and medical expenses and payment from the Wand Estate of his personal income taxes.
 
 
 3
 Mrs. Wand executed codicils to her will in 1972, 1977, and 1982, each changing Mr. Fuller's life interest. Mrs. Wand died September 4, 1985. Mr. Fuller, an 83 year old man with an independent annual income of $82,920, frugal, healthy and with modest needs, began receiving his benefits under the will. The estate obtained a reformation of the will in state court on January 25, 1988, changing Mr. Fuller's interest to a flat $122,000 per year and nothing else. This reformation eliminated payment of medical expenses, taxes and maintenance and improvements to the residence, in order to qualify for the estate tax charitable deduction under Internal Revenue Code Sec. 2055. The estate then applied for a refund of the taxes paid on the remainder interest.
 
 
 4
 The IRS denied the claim because it determined that the remainder interest was not a "reformable interest" under the Tax Code, so the conversion of the interest to a remainder annuity trust by the state court reformation could not qualify the remainder for a charitable deduction. The district court concluded on summary judgment that the remainder interest was a reformable interest, that the will was executed prior to 1979, and that the charitable remainder's interest was "presently ascertainable" at the time of Wand's death.
 
 
 5
 The government argues, first, that the will was republished by a 1982 codicil, so it cannot be treated as executed before 1979. Execution has to have been before 1979 to qualify. Second, the government argues that the value of the remainder was not ascertainable at the time of Mrs. Wand's death, so it cannot qualify for the charitable deduction. We review the summary judgment de novo. Johnson v. Moore, 948 F.2d 517, 519 (9th Cir.1991). We review the district court's interpretation of state law de novo. Matter of McLinn, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).
 
 II. Date of Publication
 
 6
 The statute on charitable remainders, 26 U.S.C. Sec. 2055, was amended in the 1969 Tax Reform Act, Pub.L. No. 91-172, Sec. 201(d)(1), 83 Stat. 487. The amendments imposed more demanding requirements on the charitable remainder, to assure that the estate could not get the benefit of the deduction if the will did not provide a sufficiently certain interest for the charitable remainderman. The new requirements would of course thwart the purposes of some wills drafted according to the old standards. Since people often live for many years after making their wills, the 1969 revisions created potential problems for people who made their wills before the 1969 reform but died afterward. Congress ameliorated these problems by providing for reformation of a will, even after the testator's death, to change a "reformable interest" into a "qualified interest." 26 U.S.C. Sec. 2055(e)(3). See H.R.Rep. No. 432, 98th Cong., 2nd Sess., 1516 (1984), reprinted in 1984 U.S.C.A.A.N. 697, 1156 (making permanent provisions that allow reformation of "split interest charitable contributions which do not meet the requirement ... of the Tax Reform Act of 1969") The standards for a "reformable interest" are less stringent for wills executed before 1979:
 
 
 7
 (iv) SPECIAL RULE FOR WILL EXECUTED BEFORE JANUARY 1, 1979, ETC.--In the case of any interest passing under a will executed before January 1, 1979, or under a trust created before such date, clause (ii) [requiring that beneficiary's interest be fixed] shall not apply.
 
 
 8
 26 U.S.C. Sec. 2055(e)(3)(C)(iv). Mrs. Wand's will was executed in 1971, but her third codicil was executed in 1982. Does the third codicil prevent the estate from relying on the special rule quoted above, thus depriving the will of reformability?
 
 
 9
 The 1982 codicil leaves the will substantially as it was before, and does not change the identity of the person holding the life interest, or of the charitable remainderman, so we need not reach the question of whether a more extensive 1982 change in the substance of the will would affect the deduction. All the 1982 codicil does is increase Mr. Fuller's monthly cash amount by $250. The codicil recites that "I confirm and republish" the 1971 will and the earlier codicils.
 
 
 10
 The government argues that the republication of the will in 1982 amounts to execution in 1982. Under California law, republication of the will is "tantamount" to making and executing the will at the time of republication, In re Challman's Estate, 127 Cal.App.2d 736, 274 P.2d 439, 442 (1954), because "in substance, the will is re-executed as of that time." Simon v. Grayson, 15 Cal.2d 531, 102 P.2d 1081, 1082 (1940). This general rule holds except where republication would "defeat [the] testator's most probable intention." In re McCauley's Estate, 138 Cal. 432, 71 P. 512, 513-14 (1903).
 
 
 11
 Mrs. Wand republished her will in 1982. The codicil says "I confirm and republish my [1971] Will," and is itself published before the two witnesses to the codicil. California law has long treated execution of a codicil as republication of the will. In re Matthews Estate, 176 Cal. 576, 169 P. 233 (1917).
 
 
 12
 The government's argument fails at the next step however, treating publication as equivalent to execution for purposes of the quoted statutory language in the estate tax reformability provision.[1] Publication has the effect of execution for some purposes, but Congress did not use the words "publication" and "execution" as synonyms.
 
 
 13
 In ordinary legal usage, the words mean different things. The word "execution" in connection with a document such as a will means signing it. Ballentine's Law Dictionary 433 (3d ed. 1969). The word "publication" ordinarily means the act by the testatrix of telling her witnesses that the document is intended to be her will. Id. at 1019; see 79 AmJur 2d, Wills, Sec. 256 (1975). Both acts are often performed at the same time in a single ceremony, and are referred to in a single statute on execution of wills. See Uniform Probate Code Sec. 2-502. But they are physically and temporally distinguishable.
 
 
 14
 The government would read the federal statutory language, "under a will executed before January 1, 1979," 26 U.S.C. Sec. 2055(e)(3)(C)(iv) (emphasis added), as though it said "under a will executed before January 1, 1979 and not subsequently republished." At one time, the statute did read something like this. As enacted in the Tax Reform Act of 1969, the special rule was limited to "property passing under the terms of a will executed on or before October 9, 1969--(i) if the decedent dies before October 9, 1972 without having republished the will after October 9, 1969 by codicil or otherwise,...." Tax Reform Act of 1969, Pub.L. 91-172, Sec. 201(g)(4)(B), 83 Stat. 487 (1969) (emphasis added), reprinted in 1969 U.S.C.A.A.N. 509, 604.
 
 
 15
 Congress deleted the emphasized language in 1974. Pub.L. 93-483, 88 Stat. 1457 (1974), reprinted in 1974 U.S.C.A.A.N. 1671. The reference to publication as well as execution in the original version, and deletion of the publication provision in the revised version, suggests that Congress meant to distinguish execution from republication for tax purposes, and intended to delete the requirement of no post-1978 republication. Deletion of the republication by codicil language was part of a group of amendments intended to alleviate what Congress perceived as a problem of charities losing money to taxes. Congress perceived a need for a more extended period to conform wills and trusts to the complicated requirements of the 1969 Tax Reform Act. S.Rep. No. 1063, 93d Cong., 2d Sess. 3 (1974), reprinted in 1974 U.S.C.A.A.N. 5985, 5988. Given the problem the statute was intended to solve, we cannot read "execution" as though it included republication by codicil, the very thing which Congress deleted.
 
 
 16
 The California statutes on execution of wills use the words in their ordinary legal significance. See Cal.Prob.Code Sec. 6110-6113. California law treats later republication as equivalent to execution, but this is a legal fiction to accomplish the testatrix's intent, not a physical fact. In re McCauley's Estate, 138 Cal. 432, 71 P. 512, 514 (1903). The doctrine treating republication as equivalent to execution saves wills invalidly executed, and revives revoked wills; California has not applied it to thwart bequests made by the republication of wills. See Id.; In re McDole's Estate, 215 Cal. 328, 10 P.2d 75, 76 (1932); In re Estate of Herbert, 131 Cal.App.2d 666, 281 P.2d 57, 58 (1955). The legal fiction treating republication as equivalent to execution therefore should not be employed if to do so would thwart rather than serve the testatrix's intentions. Clearly, Mrs. Wand's intention under her pre-1979 will to benefit Occidental College would be thwarted if $1.4 million were diverted from the college to the government because of her subsequent republication of her will.
 
 
 17
 Our construction of the "will executed before January 1, 1979" language to refer only to execution, not to republication, is in accord with the generally liberal approach of other circuits toward 26 U.S.C. Sec. 2055. Oxford Orphanage v. United States, 775 F.2d 570, 575 (4th Cir.1985); Estate of Crafts v. Comm'r of Internal Revenue, 74 T.C. 1439, 1455, 1980 WL 4614 (1980); Flanagan v. United States, 810 F.2d 930, 932 n. 2 (10th Cir.1987) (Sec. 2055(e) evinces a congressional intent to provide liberal savings provisions for charitable interests). Taken literally, the words "execution" and "publication" relate to different acts. Considered in light of the congressional intent, the distinction carries out the legislative purpose. The terms have a practical distinction related to the legislative purpose as well. Some testators may have modified their wills after 1979 by codicils changing only details, in order to save the lawyers' fees associated with comprehensive rewriting of the wills in their entirety. If so, the 1974 statutory revision, as we construe it, would avoid a trap for the unwary which would divert from the charitable remaindermen money which Congress meant for them to receive.
 
 III. Ascertainability
 
 18
 The government's other argument is that the value of Occidental College's remainder was not "presently ascertainable" at the time of Mrs. Wand's death. The regulations now codify the requirement that the value of the charitable beneficial interest under a testamentary trust may be taken "only insofar as that interest is presently ascertainable." Treas.Regs. Sec. 20.2055-2(a). The relevant part of the 1971 will provides:
 
 
 19
 1. My said Trustee shall pay from the income or from the principal, if necessary, of said trust to my trusted employee, JAMES M. FULLER, the sum of Two Hundred Fifty Dollars ($250.00) per month for the term of his natural life. [amount later raised]
 
 
 20
 ....
 
 
 21
 2. I direct that my house located at 1144 Crestline Drive, Las Positas Estates, Santa Barbara, California, be held and maintained by my said Trustee during the lifetime of said JAMES M. FULLER. There shall be paid from my Trust all taxes, all expenses of maintenance, repairs or improvements on said house. The use of said house as so maintained shall be provided for my said employee, JAMES M. FULLER, for the term of his natural life.
 
 
 22
 3. Further, I direct my said Trustee to pay from the income or, if necessary, from the principal of said Trust all unusual and exceptional expenses of said JAMES M. FULLER, such as hospital, medical, dental bills and to pay all income taxes due from said JAMES M. FULLER to the United States of America and to the State of California during the period of his life.
 
 
 23
 The primary purpose and intent in creating this Trust is to provide for said JAMES M. FULLER, and the rights and interests of remainderman are subordinate and incidental to that purpose. The provisions of this Trust shall be liberally construed in the interest and for the benefit of said JAMES M. FULLER, however, the Trustees shall consider JAMES M. FULLER's independent income and other resources outside the Trust Estate in reaching such decisions covered by this paragraph.
 
 
 24
 (Emphasis added). The government claims that the two emphasized provisions of this trust, those for improvements to the home and for payment of Mr. Fuller's personal income taxes, fail the "or presently ascertainable" test.
 
 
 25
 Three leading Supreme Court cases and one from our own circuit guide us in our determination of whether the charitable interest is "presently ascertainable." These cases indicate that the test has not been construed to require mathematical certainty such that the dollar amount which the charitable remainderman would receive could be accurately calculated as of the time of the testatrix's death.
 
 
 26
 In Ithaca Trust Co. v. United States, 279 U.S. 151, 49 S.Ct. 291, 73 L.Ed. 647 (1929), the Court held that a trust providing the testator's widow with any sum "that may be necessary to suitably maintain her in as much comfort as she now enjoys" met the standard. Id. at 154, 49 S.Ct. at 291. Her present level of comfort, was "fixed in fact and capable of being stated in definite terms of money." Id. Her interest was to be "settled as of the date of the testator's death." Id. at 155, 49 S.Ct. at 291.
 
 
 27
 "Comfort" is ascertainable enough, but "happiness" is not. In Merchants Nat'l Bank of Boston v. Comm'r of Internal Revenue, 320 U.S. 256, 64 S.Ct. 108, 88 L.Ed. 35 (1943), a power to invade principal as the trustee deemed "wise and proper for the comfort, support, maintenance, and/or happiness of the testator's widow" failed the test, so the charitable deduction for the remainder was properly disallowed. The "taxpayer has the burden of establishing that the amounts which will either be spent by the private beneficiary or reach the charity are thus accurately calculable." Id. at 261, 64 S.Ct. at 111. The widow's happiness had involved the purchase of two fur coats, two automobiles, travel, sending a grand nephew through medical school, and financial assistance to a niece, noted by the court in the context of its determination that "the purposes for which the widow could, and might wish to have the funds spent, do not lend themselves to reliable prediction." Id. at 262, 64 S.Ct. at 111.
 
 
 28
 "Pleasure" is more like "happiness" than "comfort." In Henslee v. Union Planters Nat'l Bank & Trust Co., 335 U.S. 595, 69 S.Ct. 290, 93 L.Ed. 259 (1949), the charitable deduction for the remainder was lost because the trustees were granted discretionary authority to expend "either income or principal, for the pleasure, comfort and welfare of my mother." Id. at 596, 69 S.Ct. at 291. The testator's mother was eighty-five, lived frugally for only three more years, and never requested the trustee to invade the principal. Id. at 597, 69 S.Ct. at 291. But the ascertainability test had to be applied as of the time the testator died, and the priority given to the testator's mother's pleasure and desire made the trustees' duty to the charitable remaindermen "ineffective to guarantee preservation of any predictable fraction of the corpus." Id. at 598, n. 3, 69 S.Ct. at 292, n. 3.
 
 
 29
 That the trust funds could be used to cover expenses from "accident, illness, or other unusual circumstances" did not undermine the ascertainability of the charitable remainder in Comm'r of Internal Revenue v. Bank of America Nat'l Trust and Sav. Ass'n., 133 F.2d 753, (9th Cir.1943). Although it was left to the trustee's "judgment" to decide what expenses arising from such "unusual circumstances" were "reasonably necessary," we nonetheless found the value of the charitable remainder to be sufficiently certain in that case. Id. at 753-54.
 
 
 30
 In Mrs. Wand's will, the improvements clause is in the context of keeping up the house: "all expenses of maintenance, repairs or improvements on said house. The use of said house as so maintained...." (emphasis added). The government correctly distinguishes improvements from repairs, but the distinction is not enough to destroy ascertainability in the context of this particular will. The phrase "as so maintained" limits permissible improvements to those which would maintain the house in its condition as of the time the testatrix died. The meaning of "improvements" in this context is better amplified by the accompanying words, noscitur a sociis, than by the notion that Mr. Fuller might be empowered to order the trustees to improve the house however he might desire.
 
 
 31
 A house may sometimes need improvements in order to remain in substantially the same condition of usefulness, as when a drain must be installed to prevent flooding, yet such an expense is no less ascertainable than that which will be necessary to maintain the life tenant in "comfort," cf. Ithaca, and is about the same as "upkeep." Cf. Bowers v. South Carolina Nat'l Bank of Greenville, 228 F.2d 4 (4th Cir.1955). For example, Mr. Fuller needed a handrail to move about the house. The handrail was probably an improvement rather than maintenance, but it was no more than necessary to maintain the house for his use, and no less ascertainable than his comfort. Nothing about the phrase "improvement" suggests unlimited subjective power in Mr. Fuller to improve the house beyond what would be necessary to so maintain it. Cf. Salisbury v. United States, 377 F.2d 700, 704-05 (2nd Cir.1967). The government argues that discretion to invade the corpus for "improvements" destroys ascertainability, under In re McCord's Estate, 516 F.2d 832, 836 (6th Cir.1975), cert. denied sub. nom. U.S. Bratton v. United States, 423 U.S. 995, 96 S.Ct. 422, 46 L.Ed.2d 369 (1975), but there the testatrix's "primary objective" was the "betterment of the condition under which my daughter is living," id. at 833, suggesting change, while here, the phrase "as so maintained" suggests stability.
 
 
 32
 As for the trustee's power to invade principal to pay Mr. Fuller's federal and state income taxes, this bequest is no more unascertainable in amount than invasion of principal for the beneficiary's future "comfort," or to cover those "reasonably necessary" expenses occasioned by accident or illness. The amount of Mr. Fuller's income taxes would have nothing to do with such untrammeled standards as his "happiness," "desire," or "pleasure." Cf. Ithaca, Comm'r of Internal Revenue, Merchants, Henslee. We agree with the Second Circuit that a power to invade principal for income taxes does not give the life beneficiary "significant volitional power" over the charitable remainderman, and, so does not lack the objectivity necessary of present ascertainability. Schildkraut's Estate v. Comm'r of Internal Revenue, 368 F.2d 40, 47 (2nd Cir.1966), cert. denied, 386 U.S. 959, 87 S.Ct. 1028, 18 L.Ed.2d 107 (1967). The instrument at issue in the Revenue Ruling cited by the government, Rev.Rul. 71-221, unlike Mrs. Wand's will, involved a power to invade for any kinds of taxes, and numerous and indeterminate life beneficiaries.
 
 
 33
 AFFIRMED.
 
 FLETCHER, Circuit Judge, dissenting:
 
 34
 I respectfully dissent.
 
 
 35
 We are faced with technical issues which require technical answers. The Tax Reform Act of 1969, Pub.L. No. 91-172, reprinted in 1969 U.S.C.C.A.N. 509, radically changed the rules and radically restricted charitable trust deductions. Ameliorative transition rules for instruments crafted under the old rules were adopted. But strict adherence to the exceptions contained in the transition rules is required.
 
 
 36
 To prevail in this case, Wells Fargo Bank (the taxpayer) must establish two things: (1) that the testatrix executed her will before January 1, 1979; and (2) that the will met the requirements to qualify for a charitable deduction under pre-1969 tax law (the remainder had to be ascertainable at the time of death). Failing either of these two tests, the remainder interest was not "reformable" and would not qualify for a charitable deduction. The exercise is not simply post-death to make the remainder certain by amendment, reform, or disclaimer. The instrument must meet the threshold statutory criteria at the moment of death.
 
 
 37
 The majority's argument that republication is not "execution" within the meaning of 26 U.S.C. Sec. 2055(e)(3)(C)(iv), because the 1974 amendment deletes certain language regarding "republish[ing]," is appealing, but not fully persuasive. I do not rest my dissent, however, on my unease over the majority's holding on that issue. The lack of a "presently ascertainable" remainder interest is the more significant obstacle. A charitable deduction may be taken for the value of Occidental College's interest only insofar as that interest is, at the time of Anita Wand's death, "presently ascertainable, and hence severable" from the noncharitable interest of James Fuller. See Merchants Nat'l Bank v. C.I.R., 320 U.S. 256, 260, 64 S.Ct. 108, 111, 88 L.Ed. 35 (1943) (internal quotation marks omitted). Fuller's piece of the pie "embrace[s] factors which cannot be accounted for accurately by reliable statistical data and techniques." See id. at 261, 64 S.Ct. at 111. Because "neither the amount which [Fuller] will use nor the present value of the gift [to Occidental College] can be computed, deduction is not permitted." See id. (emphasis added).
 
 
 38
 Wand's 1971 will provides that the trust's principal be used to pay "all taxes, all expenses of maintenance, repairs or improvements on [the Santa Barbara] house" and that "[t]he use of said house as so maintained shall be provided for ... JAMES M. FULLER, for the term of his natural life." Maj. op. at 834. Contrary to the majority's analysis, id. at 835, the phrase "as so maintained" is not limitational, in either a contextual or inherent sense. I suggest its most likely meaning is that any improvements made by Fuller also must be maintained at the expense of the trust. The vagaries of unspecified "improvements" is much closer to Merchants National Bank 's "happiness" provision than to Ithaca Trust Co. 's more specific "comfort ... she now enjoys" clause. Compare Merchants Nat'l Bank, 320 U.S. at 258, 263, 64 S.Ct. at 110, 112 (trust corpus may be invaded when trustee deems appropriate to provide for "the comfort, support, maintenance and/or happiness of my said wife"; charitable deduction disallowed) with Ithaca Trust Co. v. United States, 279 U.S. 151, 154, 155, 49 S.Ct. 291, 291, 73 L.Ed. 647 (1929) (principal may be invaded as "may be necessary to suitably maintain [my wife] in as much comfort as she now enjoys"; charitable deduction permitted).
 
 
 39
 The will further provides that the trust's principal may be used to pay Fuller's "unusual and exceptional expenses," including (but not limited to) "hospital, medical, dental bills and to pay all income taxes due from said JAMES M. FULLER." Op. at 834. The indeterminate scope of any expense, regardless of its novelty or unexpectedness, and of the amount of all of the income taxes owed by the life-time beneficiary on income from sources outside as well as inside the trust, makes present ascertainment of the remainder interest impossible.
 
 
 40
 In short, Wand's 1971 will did not bequeath a noncharitable interest either "capable of being stated in definite terms of money" or otherwise "fixed in fact." See Ithaca Trust Co., 279 U.S. at 154, 49 S.Ct. at 153. The bequests to the life tenant "are uncertain and cannot be measured with any precision, and therefore they make the amount going to charity unascertainable." See Estate of Marine v. C.I.R., 990 F.2d 136, 139 (4th Cir.1993).
 
 
 41
 I would reverse the judgment. While I am not absolutely immune from the pull of a sympathetic case, I have no power under the tax laws to reform this ill-drafted will.
 
 
 
 [1]
 The government argument that the district court erred in failing to follow the implications of certain language in an unpublished district court decision affirmed by an unpublished opinion of ours based upon an earlier and materially different version of the statute, has no weight at all. In re Burns, 974 F.2d 1064, 1067-68 (9th Cir.1992)